IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PITTSBURGH DIVISION

| | |
|---|---|
| BLAIR DOUGLASS, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>HUSQVARNA PROFESSIONAL PRODUCTS, INC.,<br><br>    Defendant. | Civil Action No. 2:25-cv-00771-CCW<br><br>FIRST AMENDED CLASS ACTION COMPLAINT |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Blair Douglass ("Douglass" or "Plaintiff"), on behalf of himself and all others similarly situated, brings this action against Defendant Husqvarna Professional Products, Inc. ("Husqvarna" or "Defendant"), and makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations pertaining to Douglass, which are based on personal knowledge:

## NATURE AND SUMMARY OF THE ACTION

1.      Defendant owns, leases, and/or operates physical facilities, including corporate offices, manufacturing facilities, shipping and distribution centers.

2.      From its physical facilities, Defendant makes various goods, like chainsaws, lawnmowers, and more, and services, like customer service, return processing, and technical support, available to consumers in Pennsylvania and across the country.

3.      Consumers may remotely access the goods and services at Defendant's physical facilities by email, or through the internet at Defendant's websites, located at

1

https://www.husqvarna.com/us/,                    https://locations.husqvarna.com/us/,

https://shop.husqvarna.com/,                    https://husqvarna.custhelp.com/app/home,

https://automower.husqvarna.com/us/index.html,       https://buying-guides.husqvarna.com/en,

https://www.redmax.com/us/, https://locations.redmax.com/us/, https://www.poulanpro.com/us/,

https://us.gardena.com/, and https://www.orbitonline.com/ (collectively, the "Website").

4.      Douglass is legally blind.

5.      As a result of his blindness, Douglass uses screen reader auxiliary aids to remotely access the goods and services available at Defendant's physical facilities through the Website.

6.      This action arises from Defendant's ongoing failure to effectively communicate with Douglass because the Website is not sufficiently compatible with screen reader auxiliary aids, thereby denying Douglass full and equal access to the goods and services available at Defendant's physical facilities.

**JURISDICTION AND VENUE**

7.      The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

8.      Upon information and belief, Defendant promotes the Website, and the goods and services it sells via the Website, in Pennsylvania and to consumers who Defendant knows reside in Pennsylvania.

9.      Defendant's in-state sales through the Website, and Defendant's in-state promotion of the Website and the goods and services thereon, are closely related to Douglass's claim that Defendant discriminates against blind shoppers when selling Defendant's goods and services on the Website.

10.     Defendant purposefully avails itself of the privilege of conducting activities in Pennsylvania by operating an interactive commercial website that facilitates the knowing and repeated transmission of computer files into Pennsylvania over the internet.[1]

11.     Upon information and belief, Defendant places files of information, or cookies, on the hard drives of the computers, smartphones, and other devices of every Pennsylvania consumer when those devices are used to visit the Website.[2]

12.     Douglass was injured when he attempted to remotely access the goods and services available at Defendant's physical facilities through the Website while Douglass was physically located in Pittsburgh, Pennsylvania.

13.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Douglass's claims occurred.

## **PARTIES**

14.     Douglass is a natural person over the age of 18.

15.     He resides in and is a citizen of Pittsburgh, Pennsylvania.

16.     He works for an area university as a Program Administrator, managing all phases of the admission process for a highly competitive science training program. Douglass is also a licensed Pennsylvania attorney. He graduated from the University of Pittsburgh School of Law.

---

[1] *See Murphy v. Rolex Watch USA, Inc.*, No. 1:23-CV-00086-SPB, 2024 U.S. Dist. LEXIS 84515, at *17-18 (W.D. Pa. May 9, 2024) (Lanzillo, M.J.) (exercising personal jurisdiction over out-of-forum website operator in a website accessibility case); *Gniewkowski v. Lettuce Entertain You Enters.*, No. 2:16-cv-1898-AJS, Order, ECF 123 (W.D. Pa. Apr. 25, 2017), *clarified by Order of Court*, ECF 169 (W.D. Pa. June 22, 2017) (Schwab, J.) (same).

[2] A. Benjamin Spencer, *Jurisdiction and the Internet: Returning to Traditional Principles to Analyze Network-Mediated Contacts*, 2006 U. Ill. L. Rev. 71 (2005), http://illinoislawreview.org/wp-content/ilr-content/articles/2006/1/Spencer.pdf.

While at Pitt Law, Douglass completed a judicial internship in the United States District Court for the Western District of Pennsylvania.

17.    Douglass has advocated for blind individuals his entire life.[3]

18.    On five occasions, the United States District Court for the Western District of Pennsylvania has appointed Douglass to represent nationwide classes of blind consumers in class actions concerning the inaccessibility of commercial websites.[4]

19.    Defendant is a Delaware limited liability company with a principal place of business in North Carolina.

20.    Defendant offers goods and services to the public from physical facilities that Defendant owns, operates, and/or controls, including its corporate offices, manufacturing facilities, and shipping and distribution centers.

21.    Defendant's physical facilities are open to the public, as Defendant allows the public to access the goods and services available at its physical facilities remotely through the Website.

---

[3] Zak Koeske, *Pitt student aims to rise above stereotype*, Pittsburgh Post-Gazette (July 23, 2009), https://www.post-gazette.com/local/south/2009/07/23/Pitt-student-aims-to-rise-above-stereotype/stories/200907230364 ("Blindness can't hold you back from doing anything you want to do[.] …Blindness is simply a physical condition. You have to make a few adaptations, but those aren't big enough to affect your ability to do a job competently. …There are always going to be some people who doubt your ability. ... I have no trouble trying to prove them wrong.").

[4] *Murphy v. Charles Tyrwhitt, Inc.*, No. 1:20-cv-00056, Doc. 47 (W.D. Pa. Feb. 16, 2022) (Baxter, J.), *Douglass v. Optavia LLC*, No. 2:22-cv-594, Doc. 38 (W.D. Pa. Jan. 23, 2023) (Wiegand, J.), *Douglass v. P.C. Richard & Son, LLC*, No. 2:22-cv-399, Doc. 55 (W.D. Pa. June 27, 2023) (Kelly, J.), *Douglass v. Mondelēz Global LLC*, No. 2:22-cv-875, Doc. 26 (W.D. Pa. Sept. 19, 2023) (Hardy, J.), and *Douglass v. iFit Inc.*, No. 2:23-cv-917, Doc. 29 (W.D. Pa. Apr. 11, 2024) (Horan, J.).

**STANDING UP FOR TITLE III OF THE ADA**

22.    "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[5]

23.    More than thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[6] and private individuals[7] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[8]

24.    Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[9] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[10]

---

[5] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (*citing* H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

[6] 42 U.S.C. § 12188(b).

[7] 42 U.S.C. § 12188(a).

[8] Johnson, *supra* note 5.

[9] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[10] *Id.* (quoting *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suite*s, 538 F.3d 1031, 1040 (9th Cir. 2008) (same).

25.     The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[11]

26.     Consistent with these policies, Douglass files this case to ensure Defendant provides full and equal access to the goods and services that Defendant makes available to the public from its physical facilities.

## SUBSTANTIVE ALLEGATIONS

27.     Screen reader auxiliary aids allow blind persons to use websites and mobile apps to remotely access physical facilities, and the goods and services retailers provide at those physical facilities, like customer service, return processing, and technical support.

28.     Two of the most commonly used aids are JAWS from Freedom Scientific (available on Windows computers), and VoiceOver (available on macOS and iOS devices).

29.     "JAWS, Job Access With Speech, is the world's most popular screen reader, developed for computer users whose vision loss prevents them from seeing screen content or navigating with a mouse. JAWS provides speech and Braille output for the most popular computer applications on your PC. You will be able to navigate the Internet, write a document, read an email and create presentations from your office, remote desktop, or from home."[12]

---

[11] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").
[12] *JAWS®*, Freedom Scientific, https://www.freedomscientific.com/products/software/jaws/ (last accessed Mar. 4, 2025).

30.    "VoiceOver is an industry-leading screen reader that tells you exactly what's happening on your device. Auditory descriptions of elements help you easily navigate your screen through simple gestures on a touchscreen or trackpad or a Bluetooth keyboard. . . . VoiceOver can also describe people, objects, text, and graphs in greater detail than ever. It's available in more than 60 languages and locales on iPhone, iPad, Mac, Apple Watch, Apple TV, and HomePod and offers deep customization options for your needs. Select and modify your favorite built-in voice for speech feedback, and tailor its verbosity, speed, and accompanying sound and haptic feedback to your own preferences."[13]



31.    The images to the right show a retailer coding its website so that blind shoppers can remotely access physical facilities, and the goods and services provided at those physical facilities.




32.    The first image illustrates what shoppers perceive visually when browsing the retailer's website with an iPhone. The second image shows the audio description highlighted for that image in green.

---

[13] *Accessibility*, Apple, https://www.apple.com/accessibility/vision/ (last accessed Mar. 4, 2025).

33. Although invisible to the eye, screen reader auxiliary aids read the highlighted text of the second image aloud to describe that image to shoppers who cannot perceive content visually.

34. In this example, when a screen reader user tabs to the image file, the website announces, "[o]ne burlap and cotton tote bag with a custom printed architectural company logo."

35. Blind shoppers require audio descriptions, frequently called "alternative text," like this to access physical facilities, and the goods and services provided at physical facilities, through a website.

36. Douglass's experience is consistent with the investigations of his counsel, which confirm that screen reader auxiliary aids cannot fully and equally access the content on the Website using VoiceOver (on mobile devices) and JAWS (on desktop devices).

37. As a result of visiting the Website in May 2024, and from investigations performed on his behalf, Douglass found he could not access Defendant's goods and services fully and equally using VoiceOver on an iPhone. For example:

(a) Defendant prevents screen reader users, like Plaintiff, from accessing various goods and services that are provided by employees working at Defendant's physical facilities, like product consumer-review and rating services. For example, the Digital Platform provides a five-star rating for many products that Defendant sells. Consumers who perceive content visually can see whether a particular product has one, two, three, four, or five stars, and base their purchasing decisions on this information. Unfortunately, Defendant fails to provide sufficiently descriptive alternative text for this important rating information. To this end, screen readers announce only the total number of reviews a product has received, thereby denying screen reader users, including Plaintiff, access to this service and the product rating information that Defendant makes available through the employees at its physical facilities. Click the following

8

link to view a short video demonstrating this access barrier: https://vimeo.com/952156045/5df25c2133.

(b) Defendant prevents screen reader users, like Plaintiff, from accessing various goods and services that are provided by employees working at Defendant's physical facilities, including services that communicate the selections a consumer makes during the buying process. For example, Defendant allows consumers to select their preferred "buying option." Defendant identifies the selected option visually by shading in green a shopper's selection. Unfortunately, Defendant fails to include alternative text to identify selections in a non-visual means, thereby denying screen reader users, including Plaintiff, access to this service that Defendant makes available through the employees at its physical facilities. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/952156155/e8df2b8c7e.

(c) Defendant prevents screen reader users, like Plaintiff, from accessing various goods and services that are provided by employees working at Defendant's physical facilities, including pricing and promotional services. For example, consumers who perceive content visually will notice that many products available for purchase through the Digital Platform include two prices. One price—a higher price—appears in strikethrough font. The other—a lower price—does not. Consumers who perceive content visually will understand that the price appearing in strikethrough font is the "old" or "original" price, while the price appearing in regular font is the "new" or "sale" price. Unfortunately, Defendant denies screen reader users, including Plaintiff, access to these pricing and promotional services because screen readers cannot identify the meanings of these two fonts so that users can make an informed decision. Instead, Defendant announces two prices for the same product, making it difficult for consumers to determine with

certainty what they signify, like different quantities, conditions, sizes, or in this case, sales. This unnecessary confusion frustrates Plaintiff's ability to make informed purchasing decisions and increases the odds he will abandon the purchase process without making a selection at all. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/952158946/7ae85623d1.

(d)    Defendant prevents screen reader users, like Plaintiff, from accessing various goods and services that are provided by employees working at Defendant's physical facilities, including customer assistance services. For example, the Digital Platform features a Chat button, which consumers may click to access Defendant's online help desk or instant messenger. This button "floats" atop all of the Digital Platform's underlying pages and content, meaning it remains on the screen at all times while consumers are navigating the Digital Platform. As a result, sighted shoppers can easily and quickly perceive and activate this button at any point during their shopping experience. Unfortunately, Defendant denies screen reader users, including Plaintiff, access to these customer assistance services because Defendant has designed the Digital Platform in such a way that screen reader users must tab through most of the content of the Digital Platform's webpages before eventually reaching the Chat button. Accordingly, screen reader users like Plaintiff are unlikely (or unable) to find help digitally purchasing the goods and services at Defendant's physical facilities or reporting the Digital Platform's access barriers so they can be fixed. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/952159463/a40de7a975.

38.    Consistent with public policy encouraging the resolution of "dispute[s] informally by means of a letter[,]" *see Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1208 (9th Cir. 2006), which "prelitigation solutions [are] clearly, the most expedient

and cost-effective means of resolving" website accessibility claims, *see Sipe v. Am. Casino & Ent. Properties*, LLC, 2016 WL 1580349, at *2-3 (W.D. Pa. Apr. 20, 2016), Douglass contacted Defendant about its inaccessible Website on July 23, 2024.

39.     The parties have since discussed Douglass's claims and while Defendant has taken some efforts to improve the accessibility of its Website, Douglass found that the Website still denies him full and equal access.

40.     For example, on VoiceOver on iPhone:

(a)     Defendant visually communicates a shopper's selected buying option by highlighting the shopper's selection in green. Consumers who perceive content visually will see this visual cue and understand what selections they've made before continuing to the checkout process. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the Website lacks alternative text to verbally communicate these selections. This ineffective communication makes it difficult, or impossible, for Plaintiff to determine what selections he's made before adding an item to his shopping cart. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1086505525/3b603cf898.

(b)     Defendant visually communicates information about prices and discounts. Consumers who perceive content visually see that many products available for purchase include two prices. One price—a higher price—appears in strikethrough font. The other—a lower price—does not. Consumers who perceive content visually will understand that the price appearing in strikethrough font is the "old" or "original" price, while the price appearing in regular font is the "new" or "sale" price. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the Website lacks sufficient alternative text to verbally

11

communicate the meanings of each font. This ineffective communication makes it difficult, or impossible, for Plaintiff to determine the price of Defendant's products. See Dennis, Strikethrough Accessibility, WebAxe.org (Oct. 21, 2023), https://www.webaxe.org/strikethrough-html-accessibility/ (utilizing strikethrough with visually hidden text to programmatically convey strikethrough semantics "will ensure that everyone understands strikethrough semantics while browsing the web which often means knowing the correct price of a product or service"). Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1086505550/54da4b1b14.

(c)    Defendant visually communicates a menu in a pop-up window on the Website. Consumers who perceive content visually can access the pop-up to view and navigate to various sections of the Website. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the Website fails to notify screen reader users when the pop-up appears. This ineffective communication makes it more difficult, or impossible, for Plaintiff to access and use this important navigational tool. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1086505586/09c5e06a76.

(d)    Defendant visually communicates the location of its customer support services with a message or chat button near the top of its checkout platform on the Website. Consumers who perceive content visually will recognize this button and understand that clicking it will redirect them to an online form to submit to request to chat with Defendant's support team. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because Defendant has not labeled the button with sufficient alternative text. This ineffective communication makes it more difficult, or impossible, for Plaintiff to find help completing an online purchase or reporting the Website's access barriers so they can be fixed.

12

Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1086505620/1bee93c303.

41.     And on JAWS 2025 on desktop:

(a)     Defendant visually communicates its cookies policy to shoppers who visit https://www.husqvarna.com/us/ from a new IP address. Consumers who perceive content visually will perceive the pop-up window in which Defendant's cookies policy appears and have an opportunity to learn and limit how Defendant collects and shares their personal information with Defendant's social media, advertising, and analytics partners. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because Defendant fails to notify screen reader users when the pop-up window appears. This ineffective communication makes it more difficult, or impossible, for Plaintiff to perceive this important legal disclosure and adjust his privacy settings.



(b)    Defendant visually communicates information about its products and services in image files on https://www.redmax.com/us/. For example, the image file below highlights various features of Defendant's Hand Pruners, including their "High carbon steel blades" and "durable construction." Consumers who perceive content visually can base their purchasing decisions on the text and pictures included in these image files. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because Defendant has not labeled the image files with sufficient alternative text. This ineffective communication makes it more difficult, or impossible, for Plaintiff to perceive and understand the information these image files contain.



(c)     Defendant visually communicates information about its customer assistance services. The https://www.poulanpro.com/ website features an "Ask an Expert" button, which consumers may click to access Defendant's help desk or instant messenger. This button "floats" atop the website's underlying pages and content, meaning it remains on the screen at all times while consumers are navigating https://www.poulanpro.com/. As a result, consumers who perceive content visually can easily and quickly perceive and activate this button during their shopping experience. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because screen reader users must tab through most of the content of the website's webpages before eventually reaching the "Ask an Expert" button. This ineffective communication makes it more difficult, or impossible, for Plaintiff to find help purchasing Defendant's goods or reporting the website's access barriers so they can be fixed.



(d)    Defendant visually communicates information about how well its products are rated by consumers. Consumers who perceive content visually will recognize a 5-star rating system on the https://us.gardena.com/ website and understand that the more stars a product has, the better it has been received by past purchasers. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the website lacks sufficient alternative text to verbally communicate this rating information. Instead, when screen readers tab to this information, Defendant announces "question mark question mark question mark link graphic." This ineffective communication makes it difficult, or impossible, for Plaintiff to determine how other consumers like or dislike a particular product.



(e)    Defendant visually communicates information about its products and services on https://www.orbitonline.com/, but this information is inaccessible to screen reader users. For example, Defendant communicates how far shoppers are from free shipping. Consumers

who perceive content visually can base their purchasing decisions on this information. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because Defendant has developed the website in such a way that screen readers skip this information and focus on the "Add to Cart" buttons beneath it. This ineffective communication makes it more difficult, or impossible, for Plaintiff to perceive this important benefit.



42.    Defendant's ongoing failure to effectively communicate with Douglass, together with Defendant's insufficient policies and practices giving rise to this ineffective communication, deny Douglass full and equal access to Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities.

43.    Defendant's ongoing failure to effectively communicate with Douglass, together with Defendant's insufficient policies and practices giving rise to this ineffective communication, humiliate and deter Douglass from using the Website to access Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities.

44.    Still, Douglass intends to return to the Website within the next six months to determine if Defendant effectively communicates with Douglass and, if so, to attempt to access Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities.

## CLASS ALLEGATIONS

45.    Douglass brings this class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) on behalf of himself and the following nationwide class: all blind or visually disabled individuals who use screen reader auxiliary aids to navigate digital content and who have accessed, attempted to access, or been deterred from accessing or attempting to access, or who will access, attempt to access, or be deterred from accessing or attempting to access the Website from the United States.

46.    Numerosity: The class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective class members through this class action will benefit both the parties and this Court, and will facilitate judicial economy.

47.    Typicality: Plaintiff's claims are typical of the claims of the members of the class. The claims of Plaintiff and members of the class are based on the same legal theories and arise from the same unlawful conduct.

48.    Common Questions of Fact and Law: There is a well-defined community of interest and common questions of fact and law affecting members of the class in that they all have been, are being, and/or will be denied their civil rights to full and equal access, and use and enjoyment of Defendant's Website and/or services due to Defendant's failure to make the Website fully accessible and independently usable as described herein.

18

49.     Adequacy of Representation: Plaintiff is an adequate representative of the class because his interests do not conflict with the interests of the members of the class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the class, and he has no interests antagonistic to the members of the class. Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation, generally, and who possess specific expertise in the context of ADA litigation.

50.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the class, making appropriate both declaratory and injunctive relief with respect to Plaintiff and the class as a whole.

## SUBSTANTIVE VIOLATION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq*.

51.     The assertions contained in the previous paragraphs are incorporated by reference.

52.     Douglass and the class members are persons with a "disability." 42 U.S.C. §§ 12102(1)(A), 12102(2)(A).

53.     Defendant is a "public accommodation." 42 U.S.C. §§ 12181(7)(E).

54.     Defendant violated the ADA by, among other things, denying Douglass and the class the full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations; denying Douglass and the class an opportunity to participate in or benefit from goods, services, facilities, privileges, advantages, or accommodations; providing Douglass and the class an unequal opportunity to participate in or benefit from goods, services, facilities, privileges, advantages, or accommodations; excluding Douglass and the class, denying them services, and treating them differently than others because of the absence of auxiliary aids and services, or the failure to modify policies and practices; and failing to effectively communicate with Douglass and

the class. 42 U.S.C. §§ 12182(a), 12181(b)(1)(A)(i), 12181(b)(1)(A)(ii), 12182(b)(2)(A)(ii), 12182(b)(2)(A)(iii).

55.    These violations denied Douglass and the class full and equal access to Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities.

56.    These violations also humiliate and deter Douglass and the class from using the Website to access Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities, thereby forcing Douglass and the class to wait until Defendant elects to retrofit the Website to be accessible.

## PRAYER FOR RELIEF

WHEREFORE, Douglass requests judgment as follows:

(A)    An order certifying the proposed class, appointing Douglass as representative of the proposed class, and appointing undersigned counsel as counsel for the proposed class;

(B)    A declaratory judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took insufficient action to ensure Douglass and the class could use the Website to fully, equally, and independently access Defendant's physical facilities and the goods and services that Defendant makes available at its physical facilities;

(C)    A permanent injunction under 42 U.S.C. § 12188(a)(2) and 28 C.F.R. § 36.501 which directs Defendant to take all steps necessary to ensure Defendant's physical facilities and the goods and services that Defendant makes available at its physical facilities are fully, equally, and independently accessible to Douglass and the class by the Website, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has

adopted and is following policies and practices that will cause Defendant to remain in compliance with the law—the specific injunctive relief requested by Douglass is described more fully below;

(1)    Within 60 days of the Court's order, Defendant shall designate a team of its employees and/or contractors as the accessibility coordination team for the Website, which team will be responsible for ensuring Defendant's compliance with the Court's order;

(2)    Within 90 days of the Court's order, Defendant shall appoint or retain an Accessibility Consultant who is knowledgeable about digital accessibility, the ADA, and the Web Content Accessibility Guidelines 2.1 A/AA, developed by the W3C and available at https://www.w3.org/TR/WCAG21/. The Accessibility Consultant's duties shall include assisting Defendant in ensuring the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA and provides effective communication to screen reader users.

(3)    Within 120 days of the Court's order, Defendant shall develop and implement an Accessibility Strategy designed to ensure the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA and provides effective communication to screen reader users within 18 months of the Court's order.

(4)    Within 120 days of the Court's order, Defendant shall develop and publish an Accessibility Statement that advises visitors that Defendant is making efforts to ensure that its Website conforms with Web Content Accessibility Guidelines 2.1 A/AA and provides effective communication to screen reader users, and includes an accessibility feedback form that invites visitors to contact Defendant with their accessibility concerns or questions. Defendant shall add a link at the beginning of the Website's landing pages, directing screen reader users to the Accessibility Statement.

(5)    Within 150 days of the Court's order, Defendant shall ensure its customer service personnel are trained to assist individuals with disabilities (including individuals who are blind) who encounter difficulties using the Website, and to forward any accessibility-related questions or complaints to Defendant's accessibility coordination team so they may be remediated.

(6)    Within 180 days of the Court's order, Defendant shall modify its existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Website to fail to provide effective communication to screen reader users. Defendant shall ensure that any bugs that cause the Website to fail to provide effective communication to screen reader users are remedied with the same level of priority (e.g., speed, resources used to remedy, etc.) as any other equivalent loss of function for individuals who are not blind.

(7)    Within 210 days of the Court's order, Defendant shall train all employees responsible for website or mobile application design, development, or maintenance to ensure the future design, development, and maintenance of the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen reader users. Defendant shall provide accessibility training to all newly-hired employees responsible for website or mobile application design, development, or maintenance within the latter of 210 days of the Court's order or 90 days of their hire date. Commencing in 24 months of the Court's order, Defendant shall ensure that all then-current employees responsible for website or mobile application design, development, or maintenance are provided with refresher accessibility training at regular intervals that shall not exceed two years.

(8)    Until furthered ordered by the Court, Defendant or its Accessibility Consultant shall perform an automated accessibility audit on at least a monthly basis to evaluate whether the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides

22

effective communication to screen readers. At minimum, the monthly accessibility audit shall include each home or landing page of the Website, and a sampling of web pages that visitors would access to (a) perform a search, (b) view a product, (b) complete a purchase, and (d) contact customer service.

(9)    Until furthered ordered by the Court, Defendant or its Accessibility Consultant shall perform end-user accessibility/usability testing on at least a quarterly (four times per year) basis to evaluate whether the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen readers. At minimum, the quarterly end-user accessibility test shall include each home or landing page of the Website, as well as a sampling of web pages that that visitors would access to (a) perform a search, (b) view a product, (b) complete a purchase, and (d) contact customer service.

(10)    Until furthered ordered by the Court, for each new, renewed, or renegotiated contract with a vendor of third-party content, Defendant shall seek a commitment from the vendor to provide content that conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen readers.

(11)    Defendant shall provide Douglass, through his counsel, with a report on the first, second, and third anniversaries of the Court's order which summarizes the progress Defendant is making in meeting its obligations under the Court's order.

(D)    Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(E)    Payment of costs of suit;

(F)     Payment of reasonable attorneys' fees under 42 U.S.C. § 12205 and 28 C.F.R. § 36.505, including costs to monitor Defendant's compliance with the judgment;[14]

(G)     Whatever other relief the Court deems just, equitable and appropriate; and

(H)     An order retaining jurisdiction over this case until Defendant has complied with the Court's orders.

Dated: July 28, 2025

/s/ Kevin W. Tucker
Kevin W. Tucker (He/Him) (PA 312144)
Kevin Abramowicz (He/Him) (PA 320659)
Chandler Steiger (She/Her) (PA 328891)
Stephanie Moore (She/Her) (PA 329447)
Kayla Conahan (She/Her) (PA 329529)
Jessica Liu (She/Her) (PA 328861)
**EAST END TRIAL GROUP LLC**
6901 Lynn Way, Suite 503
Pittsburgh, PA 15208
Tel. (412) 877-5220
Fax. (412) 626-7101
ktucker@eastendtrialgroup.com
kabramowicz@eastendtrialgroup.com
csteiger@eastendtrialgroup.com
smoore@eastendtrialgroup.com
kconahan@eastendtrialgroup.com
jliu@eastendtrialgroup.com

---

[14] *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987); *People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 235 (3d Cir. 2008) ("This Court, like other Courts of Appeals, allows fees to be awarded for monitoring and enforcing Court orders and judgments."); *Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11).